FULLER & JOHNSON MANUFACTURING COMPANY (LIMITED), Respondent, vs. BARTLETT, Appellant.

*December 16, 1886 — February 1, 1887.*

PATENTS: EQUITY. *(1) Jurisdiction of state courts. (2) Invention by employee: Implied contract to assign: License. (3) Specific performance.*

1. A state court has jurisdiction of an action to compel the performance of a contract to assign the right to a patent for an invention, when both the parties, at the time of the contract, were residents of the state.

2. The superintendent of a manufacturing company, knowing its intention to perfect and put upon the market a new machine, voluntarily disclosed his conception of a device to be used in connection therewith, and, under the direction of the company and with its material and at its expense, voluntarily went to work to perfect such device and construct the machines and to aid in putting them upon the market. *Held,* that from such facts the law would not imply an agreement for the absolute assignment to the company of the patent for such device, but would imply an agreement for

a license to the company to manufacture perpetually, at its then existing works, machines embodying such invention, and to sell them wherever it could find a market.

3. Equity will compel specific performance of such implied contract for a license.

APPEAL from the Circuit Court for *Dane* County.

The following statement of the case was prepared by Mr. Justice CASSODAY:

This action is to enforce the specific performance of an alleged implied contract to assign to the plaintiff an invention made by the defendant while in the employment of the plaintiff, commenced March 8, 1885, and before procuring the patent. The answer, in effect, denied the making of any such contract, and alleged that the defendant was the sole inventor and the exclusive owner of the invention, and entitled to the exclusive use of it. On the trial it appeared from the undisputed evidence or the findings of the court, as matters of fact, in effect, that in 1879 and 1880 the defendant was in the employment of Walter A. Wood Mowing & Reaping Machine Company, in the business of which the then firm of Fuller & Johnson, composed of M. E. Fuller and John A. Johnson and at least two other large stockholders of the plaintiff, were interested and had a share of the profits and a large supervision and direction of the defendant's services; that during said time the defendant invented a grasping device, and voluntarily applied the same to the reaping and binding machines then being manufactured by the said Walter A. Wood Mowing & Reaping Machine Company; that in a conversation with said Fuller & Johnson as to his right to a patent and the ownership of said grasping device, the defendant was informed by them, in substance, that he had no such ownership or right, inasmuch as the device was invented and made by him while in that company's employment, pursuant to their direction, and with their time, materials, and the service of other em-

ployees of said company; that said Fuller & Johnson continued ever since to entertain the same views; that September 14, 1880, the defendant, with full knowledge of the views so entertained by the said firm of Fuller & Johnson, and acquiescing in the same, entered into an agreement in writing with the said firm of Fuller & Johnson, whereby he agreed to work for them, or any one else they might designate, " at selling, settling and collecting for, and setting up, starting, and repairing, harvesting machines, . . . and for that purpose agreed to go to any place designated by " them; " at any time in the month of October, and continue for one year; " for the faithful performance of such service, the said firm agreed therein to pay him $1,400 for one year, and at that rate, and to pay all his necessary traveling expenses while away from home; that the defendant remained in such employment until in February, 1882, when he was directed by Fuller & Johnson to come to Madison and take the position of superintendent of their works engaged in the manufacture of agricultural machinery, but at the same salary, which he did; that during such employment the defendant and said Johnson invented a ratchet to the mowing machine of said firm, and the said firm procured a patent therefor at the expense of the firm in the joint names of the defendant and said Johnson, and the same was assigned by both of them to the firm, without any objection from either; that August 6, 1883, the defendant gave notice of his resignation as such superintendent, to take effect October 1, 1883, and the same was accepted August 23, 1883; that in September, 1883, the defendant was induced by said firm to withdraw such resignation and consent to a re-employment as such superintendent at a salary of $2,000 for one year, and at that rate; that it was the purpose of said firm in effecting such re-employment, and it was then agreed by and between the defendant and said firm, that they would bring a new mower into the market,—

a marketable machine,— as good, if not superior, to any other machine in the market, not only in workmanship but in improvements; that January 19, 1884, the said Fuller & Johnson Manufacturing Company was duly and lawfully changed to the plaintiff corporation; that, in the spring of 1884, John A. Johnson of said firm, and then president of the plaintiff company, conceived a plan for a tilting shoe on said mower, and directed the defendant, as such superintendent, to carry it out, which he did, and completed a machine which worked very well, but not to the satisfaction of the company; that at a meeting of the executive committee of the plaintiff (of which the defendant and said Johnson were members), in May, 1884, as before, the defendant opposed the application to such mower of any tilting device or shoe, claiming that it would not improve the machine, but suggested that he had an idea of one in his mind which he thought was superior to Johnson's device, and would apply it rather than to have Johnson's device made, as he thought it would work better; that the defendant then explained his idea to the committee or board as well as he could without drawings; that the committee were reluctant to take hold of it, as the plaintiff had already been to a good deal of expense; that Johnson disapproved of it; that finally the committee concluded to make one machine according to the defendant's idea, and directed the defendant to do so; that the plaintiff, at the request of the defendant, sent for and bought a certain mower, with a tilt upon it, to aid the defendant in getting up such invention; that the defendant, at the request of the plaintiff, then directed the plaintiff's draughtsman to make the necessary drawings, and the plaintiff's pattern-makers to make the necessary patterns; that such drawings and patterns were, from time to time, submitted to the other members of the committee, who made suggestions in relation thereto; that finally a machine embodying the defendant's invention was

completed, in July, 1884, and was found to operate well; that the plaintiff expended in the construction of said machine, and twenty-five or thirty trial machines,— including drawings, patterns, templets, forms, flasks, files, dies, tools, etc., for the manufacture of such machines, from $3,000 to $5,000; that such machine and such drawings, patterns, dies, etc., were made wholly from materials belonging to the plaintiff, by the defendant and other workmen in the employment of the plaintiff, and during business hours and the time they were respectively paid for by the plaintiff, and for the purpose of perfecting a mower to be thereafter manufactured by the plaintiff; that the defendant so disclosed his idea or conception, and did and consented to do the other things mentioned, with full knowledge on his part that the plaintiff was making such expenditures with the expectation and belief that such invention would be the property of the plaintiff and that it would have the perpetual right to continue such manufacture of such machines; and that during all of said time, and down to January, 1885, the defendant acquiesced in and admitted such rights of property in said invention in the plaintiff; that in September, 1884, and in pursuance of such understanding and agreement between the plaintiff and defendant, the plaintiff, with the consent and co-operation of the defendant, did make application to its patent attorneys in Chicago to procure for the plaintiff letters patent from the United States upon said invention in the name of said defendant; that at that time the defendant, at the request of the plaintiff, prepared a claim for such patent, which was sent by the plaintiff to its said patent attorneys; that at the same time the plaintiff wrote said patent attorneys to prepare and forward to it an assignment, to be made by the defendant to the plaintiff, of such invention and patent; that the plaintiff continued to press such application for a patent in its own interest, until within a few days prior to

the time when the defendant resigned his position as its superintendent, March 1, 1885, without knowing that the defendant had claimed such patent in his own right, which he did to said attorneys in January, 1885; that the defendant refused to execute such assignment February 14, 1885; that the defendant paid to said patent attorneys, towards the expense of procuring said patent, $60, which the plaintiff had tendered to him, but which he refused to accept; that the defendant is a nonresident of Wisconsin.

As a conclusion of law, the court found, in effect, that the plaintiff was entitled to judgment directing the defendant to assign said invention and patent to the plaintiff on payment to him, or in trust for him in case of his absence from the state, of said $60 so advanced to said attorneys; that, in case of his failure to execute such assignment, and his continuance out of the jurisdiction of the court, then that the plaintiff have judgment decreeing the same, with costs to be taxed. From the judgment entered thereon, in favor of the plaintiff and against the defendant, the defendant appeals.

*Rufus B. Smith,* attorney, and *S. U. Pinney,* of counsel, for the appellant.

For the respondent there was a brief by *Stevens & Morris,* and oral argument by *Mr. Stevens.*

CASSODAY, J. The power to promote the progress of science and the useful arts, by securing for limited times to inventors the exclusive right to their respective discoveries is vested in Congress. Sec. 8, art. I, Const. of U. S. They have enacted, in effect, that any person who has invented or discovered any new and useful machine or improvement thereof, not known or used by others before his invention or discovery thereof, and not in public use or on sale for more than two years prior to his application, unless the same is proved to have been abandoned, may obtain a pat-

ent therefor. Sec. 4886, R. S. of U. S. But notwithstanding the fact that the right of the inventor is thus secured by act of Congress, and the further fact that the circuit courts of the United States have original jurisdiction of all suits at law or in equity arising under the patent laws of the United States (subd. 9, sec. 629, R. S. of U. S.), yet the jurisdiction of the state court in this case is unchallenged and unchallengeable. The case involves no question as to the identity of the inventor, nor as to the validity or infringement of any patent that has been or may be issued to secure a monopoly of the invention. The action is based upon the breach of an alleged contract between parties, both of whom at the time resided in this state, to assign the right to the patent for the invention. In this case there can be no question but what the state court properly took jurisdiction. *Nesmith v. Calvert,* 1 Wood. & M. 34; *Hartell v. Tilghman,* 99 U. S. 547, and cases there cited. It is like an action for the specific enforcement of a contract for the sale or lease of land the title to which is held by patent from the United States. *Ibid.*

Before any inventor or discoverer can receive a patent for his invention or discovery, he must make application therefor in writing. Sec. 4888, R. S. of U. S. The applicant must make oath that he verily believes himself to be the original and first inventor or discoverer of the machine or improvement for which he solicits a patent. Sec. 4892. The specification and claim must be signed by the inventor. Sec. 4888. It stands confessed that the defendant was the inventor of the tilting device in question. Of course, every patent, or any interest therein, is assignable in law by an instrument in writing. Sec. 4898. But the defendant had obtained no patent at the time this action was commenced. Patents may, however, be granted and issued to the assignee of the inventor or discoverer, but the assignment must first be entered of record in the patent office; and in all cases of an application by an assignee for the issue of a patent, the

application must be made, and the specification sworn to, by the inventor or discoverer. Sec. 4895.

Under these statutes, it is apparent that such assignee can get no patent until he has first obtained an assignment thereof from the inventor or discoverer and complied with the conditions thus prescribed. Of course, neither the inventor nor his assignee has any exclusive right to the invention until a patent therefor has been issued; but the inchoate right to such exclusive use is vested in the inventor as soon as the invention is completed, and he may sell and assign the same, even before a patent therefor has been issued, and then the patent may issue to him or his assignee upon compliance with the statute. *Gayler v. Wilder*, 10 How. 493; *Railroad Co. v. Trimble*, 10 Wall. 379; *Hendrie v. Sayles*, 98 U. S. 546. Such assignment may not only be valid as to an existing invention, but may be broad enough to include a subsequent invention. *Railroad Co. v. Trimble, supra; Nesmith v. Calvert*, 1 Wood. & M. 39–44; *Continental Windmill Co. v. Empire Windmill Co.* 4 Fish. Pat. Cas. 428; 8 Blatchf. 295; *Wilkens v. Spafford*, 3 Ban. & A. 274; *Hammond v. M. & H. O. Co.* 92 U. S. 724.

It is here claimed, in effect, that the plaintiff expended several thousand dollars in perfecting the device in question and bringing it into public use, upon the faith of an implied contract with the defendant that he would, upon completion, assign to the plaintiff such invention and his right to letters patent therefor, but which he refused to do after being duly requested. This suit is brought to enforce the specific performance of such implied contract. It is a general rule that equity will not enforce specific performance when there is an adequate remedy at law. This court has, however, sanctioned the enforcement of a specific performance of an oral contract to execute a lease, in a case where such adequate remedy was not apparent. *Seaman v. Aschermann*, 51 Wis. 678; 57 Wis. 547.

In *Appleton v. Bacon*, 2 Black, 699, both parties claimed

title to the invention as the assignee of the inventor, North. The suit was to restrain Bacon, who had obtained letters patent for the invention dated August 10, 1858, from manufacturing, using, or selling machines embodying the invention, and for the surrender, delivering up, and cancellation of the patent, and for general relief. The principal contention was whether the invention was made by North while in the employment of Bacon or his assignor, or subsequently and while he was in the employment of the Appletons. The supreme court, reversing the decree of the trial court, found, as a matter of fact, that North made the invention after quitting the service of Bacon and while in the service of the Appletons, and accordingly remitted the cause with instructions to enter a decree for the plaintiffs, as the assignees of North, directing the defendant to surrender the patent for cancellation.

In *Binney v. Annan*, 107 Mass. 94, a bill to compel the specific performance of a contract to procure a patent and then assign it to the plaintiff, was held good. The same principle has been repeatedly sanctioned. *Continental Windmill Co. v. Empire Windmill Co.*, *supra; Wilkens v. Spafford*, 3 Ban. & A. 274; *Andrews v. Fielding*, 20 Fed. Rep. 123; *Hapgood v. Rosenstock*, 23 Fed. Rep. 86.

In this last case a bill for the specific performance of a contract with the inventor was maintained against a subsequent assignee of the patent with notice, and the court observed that, "although equity does not, as a general rule, decree specific performance of contracts relating to personal property, yet, ordinarily, adequate compensation in case of a breach may be obtained by way of damages at law. . . . Agreements for the assignment of a patent, and for delivery of chattels which can be supplied by the vendors alone, and for renewals of leases, are among those which will be specifically enforced." To the same effect is *Slemmer's Appeal*, 58 Pa. St. 155.

Such being the law, and there being no claim in this case, nor any ground for claiming, that there was any express contract on the part of the defendant to assign to the plaintiff the inchoate right to the invention, the question recurs whether, upon the facts stated, the law implies such a contract.

In the leading case of *McClurg v. Kingsland*, 1 How. 202, one Harley, in October, 1834, while in the employment of the defendants at their foundry at Pittsburgh, and after numerous experiments made therefor in said foundry wholly at the expense of the defendants, who increased his wages on account of the useful result, invented the improvement patented March 3, 1835, upon an application made February 17, 1835, and assigned the same to the plaintiffs, March 16, 1835, in pursuance of an agreement made with them in the January before. From the time of completing the invention, in October, 1834, until February, 1835, Harley remained at work in said foundry as such employee of the defendants, engaged in the manufacture of machines for them embodying such invention, without any objection or claiming any compensation for such use, and during the time proposed that they should take out a patent therefor and purchase his right, which they declined. In that suit, brought by the plaintiffs, as the assignees of the patent to Harley, against the defendants for the infringement of the same, it was held, in effect, that the facts stated justified the presumption of a license from Harley to the defendants to so use the invention, and that the plaintiffs took their assignment subject to such license. In that case stress was laid upon sec. 7 of the act of Congress of 1839, analogous to sec. 4899, R. S. of U. S., which provides that " every person who purchases of the inventor or discoverer, *or with his knowledge and consent constructs*, any newly invented or discovered machine or other patentable article, *prior to the application by the inventor or discoverer for a patent*, or who

sells or uses one so constructed, shall have the right to use, and vend to others to be used, the specific thing so made or purchased, without liability therefor." It was there said by the court, in effect, that one of the objects of the section was "to protect the person who has used the thing patented, by having purchased, constructed, or made the machine, etc., to which the invention is applied, from any liability to the patentee or his assignee;" and that it "puts the person who has had such prior use on the same footing as if he had a special license from the inventor to use his invention, which, if given before the application for a patent, would justify the continued use, after it issued, without liability." It was there contended that such protection was "confined to the specific machine," etc.; "but," observed the court, "we think that the law does not admit of such construction, whether we look at its words or its manifest objects, when taken in connection with former laws and the decisions of this court in analogous cases." The court concluded by saying: "We therefore feel bound to take the words, 'newly invented machine, manufacture, or composition of matter,' and 'such invention,' in the act of 1839, to mean the '*invention patented*,' and the words 'specific machine' to refer to '*the thing as originally invented*,' *whereof the right is secured by patent;* but not any newly-invented improvement on a thing once patented. The use of the invention before an application for a patent must be the specific improvement then invented and used by the person who had purchased, constructed, or used the machine to which the invention is applied." But while such specific license may be inferred from the mere construction of machines embodying the invention with the knowledge and consent of the inventor, prior to his application for a patent, yet this does not exclude the acquisition of a higher and more extended right by contract between the parties. Such presumption of license found in *McClurg v. Kingsland,*

*supra,* has frequently been sanctioned in other cases. *Whiting v. Graves,* 3 Ban. & A. 222; *Chabot v. American B. H. & O. Co.* 6 Fish. Pat. Cas. 71; *Hapgood v. Hewitt,* 119 U. S. 226, affirming *S. C.* 11 Fed. Rep. 422, 11 Biss. 184.

In the light of these authorities, as well as reason, it is safe to conclude that, upon the facts stated, the law implied an agreement for a license from the defendant to the plaint-iff to manufacture perpetually, at its present works, machines embodying the invention in question, and to sell the same wherever it could find a market. The very object of the plaintiff in employing its workmen, including the defendant, in making drawings, patterns, forms, flasks, files, dies, tools, machinery, etc., and in expending money experimenting with such machine, and in bringing the same into the market and introducing the same to the trade, was apparently to secure a machine as good as, if not superior to, any other, and then to continue the manufacture and sale of the same. All this must necessarily have been in the contemplation of the defendant as well as the plaintiff. Knowing such purpose, he voluntarily disclosed his conception of the invention in question. Knowing such purpose, he, under the direction of the plaintiff and with its material and at its expense, voluntarily went to work to perfect and construct such machines and to aid in putting them upon the market. But all these facts point to the manufacture by the plaintiff at its works, and then sales by it. They do not clearly and definitely point to the inhibition of such manufacture and sale by some one else, in some distant state,— as Maine, Texas, or Oregon. A patent not only gives a right to manufacture and sell, but secures to the inventor and those having rights under him the exclusive monopoly in the invention. Such monopoly extends to each and every portion of our common country. It excludes all persons from such right, unless they first acquire it from the inventor. While the facts disclosed are sufficient to support such affirmative

rights in the plaintiff, they are barren of anything to neg-
ative all the rights of the defendant as the inventor. Stress
is laid upon the fact that the defendant assigned to Fuller
& Johnson an earlier patent. It may be that he did so
without knowing his legal rights. It may be that he did
not comprehend his legal right to the invention in question
until about the time of his quitting the plaintiff's employ-
ment. Still, the question presented is whether the facts
disclosed raise an implied agreement to assign the patent to
the plaintiff absolutely. This is not to be inferred from the
mere passivity of the defendant. In the case of *Whiting v.
Graves, supra*, patents for a number of inventions made by
the employee under circumstances similar to those here dis-
closed, were issued to his employer, to whom the right in
the inventions had been assigned by the employee at or be-
fore the times of making the applications. Subsequently the
employee, during such employment, made another inven-
tion, which, before application for a patent, he assigned to his
employer upon a verbal agreement that the latter should
pay the expenses of the patent for one half interest in it,
which he did, and obtained a patent in his own name, and
then filed a bill in equity against the defendant, to whom
the employee had assigned his equitable interest in the
patent, for infringement; but it was held that the defendant
had an equitable right to one half of the patent, which con-
stituted a good defense. The mere fact that, in making the
invention, an employee uses the materials of his employer,
and is aided by the services and suggestions of his co-
employees and his employer in perfecting and bringing the
same into successful use, is insufficient to preclude him from
all right thereto as an inventor. The same is true of an in-
vention conceived wholly by an employer, and then per-
fected under his supervision by aid of the mechanical skill
and suggestions of his employees. These propositions are
sanctioned by numerous adjudications. *Agawam Co. v.*

*Jordon*, 7 Wall. 602, 603; *Collar Co. v. Van Dusen*, 23 Wall. 563, 564; *Blandy v. Griffith*, 3 Fish. Pat. Cas. 615, 616; *King v. Gedney*, 1 MacArthur Pat. Cas. 444.

The difficulty with the contrary assumption arises from confounding the machine with the invention it embodies. Of course there must be a machine which will operate before it can be patented. That implies material, workmanship, and skill combined. But such combination of itself is not enough to secure a patent. It must also embody an original conception of a new and useful method of doing a specific thing. It is this conception so embodied, evolved from the inventive faculties of the defendant, which constituted the invention in question. The law gave to him the exclusive property in it. He still retains it, except in so far as he has parted or agreed to part with it. The material, workmanship, and skill which embodied that conception remained the property of the plaintiff. But workmanship and skill are both the result of instruction, experience, and knowledge. They are acquired by being learned. They may aid and stimulate invention, but are no part of it. An invention, to be patentable, must not only *originate* with the inventor, but must be *new* and useful.

The question remains whether the plaintiff, as such licensee, is entitled to any relief in this action. In the very recent case of *Hapgood v. Hewitt, supra*, the bill of complaint was substantially like the one at bar, except as hereinafter mentioned, and sought to compel an assignment of a patent by the employee to the successors of the employer. A demurrer thereto for want of equity was sustained, and thereupon a decree was entered dismissing the bill, and the same has just been affirmed by the unanimous opinion of the supreme court of the United States. It was there held that Hewitt, as such employee, took the legal title to the patent in his own right and not as trustee for his employer, and that the latter at most had a mere license to manufact-

ure; that, as such license would be a perfect defense to an action at law for the infringement of the patent, relief in equity was properly denied and the bill properly dismissed. To the same effect is the case of *Joliet Manuf'g Co. v. Dice*, 105 Ill. 649. The case of *Hapgood v. Hewitt* is, however, distinguishable from the one at bar in the following particulars: At the time of making the invention, Hewitt was in the employment of "Hapgood & Co.," then a Missouri corporation. After the dissolution of that corporation, the suit was commenced by the *trustees* of that *dissolved* Missouri corporation, and the "Hapgood Plow Company," an Illinois corporation, as its successor, against Hewitt; and it was held that such a license was not assignable, and that as the employer corporation had dissolved and its stockholders had formed a new corporation under the laws of a different state, the new corporation acquired no right under the alleged assignment to it. Such being the character of the complainants and the holding of the court, the question was not involved as to whether the employer of the inventor, as such licensee, might have maintained an action to enforce the specific performance of such agreement to license.

In *Wilkens v. Spafford*, 3 Ban. & A. 274, the employer contracted for the exclusive benefit of the employee's inventive faculties and inventions during his term of service, and an exclusive license for the use of the machines during the existence of the patents and any extensions, renewals, or reissues of the same, was decreed. In *Hapgood v. Rosenstock, supra*, the court, in speaking of the general rule of refusing equitable relief when there is an adequate remedy at law, observed: "It is apparent that such consideration cannot apply to an agreement like the present, because, from the nature of the subject matter, it would be impossible in many cases to ascertain the damages which licensees

might sustain by reason of being deprived of their rights to use an invention;" and accordingly a purchaser of the patent was restrained from violating the terms of the agreement for the license. In *Slemmer's Appeal*, 58 Pa. St. 155, the action was brought by three of the partners against the other, who was the inventor, to compel an assignment of the patent obtained by the latter for his invention used by the firm, and made by him as a member of the firm and while engaged in the business of the firm. The trial court held that the patent belonged to the firm, and decreed accordingly. Although such decree was reversed, on the ground that the defendant, as the inventor, was the lawful owner of the patent in his own right, and the firm only entitled to a license to use the invention, yet it was held that the plaintiffs were jointly and severally entitled to such license, and the same was decreed accordingly. Such ruling seems to have been eminently just. There can be no other adequate remedy in a case like this.

The complaint is criticised mainly on the ground that it states the evidence, instead of alleging the facts. Such objection is not available on demurrer *ore tenus*, especially where, as here, the substance of the evidence is stated in the complaint, and then more fully proved upon the trial.

*By the Court.*— The judgment of the circuit court is reversed, and the cause is remanded with directions to render judgment in favor of the plaintiff and against the defendant to the effect that the latter execute and deliver to the former a license to manufacture machines embodying the invention in question at its present works, perpetually, and to sell the same anywhere in the market, free and clear from any and all liability for any fee, royalty, or otherwise, for or on account of any patent which has been or may hereafter be granted for said invention; and, in case of failure to so execute such license within a time to be named,

then that such judgment stand as and for such license, and to have that effect; and for any other and further proceedings deemed necessary to make such judgment effectual.

COLE, C. J., took no part.